BAP Appeal No. 20-41     Docket No. 38     Filed: 04/27/2021     Page:

FILED
U.S. Bankruptcy Appellate Panel
of the Tenth Circuit

April 27, 2021

Blaine F. Bates
Clerk

NOT FOR PUBLICATION[1]

# UNITED STATES BANKRUPTCY APPELLATE PANEL

## OF THE TENTH CIRCUIT

_____

| | |
|---|---|
| IN RE ALEXANDER L. BEDNAR, <br><br> Debtor. <br> _____ <br><br> JILL BEDNAR, RICK WARREN, Oklahoma County Clerk of Court, and JENNIFER BYLER, Deputy Courtroom Clerk, <br><br> Appellants, <br><br> v. <br><br> ALEXANDER L. BEDNAR and JOHN T. HARDEMAN, Chapter 13 Trustee, <br><br> Appellees. | BAP No. WO-20-041 <br> BAP No. WO-20-042 <br><br><br><br> Bankr. No. 19-14021 <br> Chapter 13 <br><br><br><br> OPINION |

_____

Appeal from the United States Bankruptcy Court
for the District of Oklahoma Western

_____

Before **ROMERO**, Chief Judge, **SOMERS**, and **PARKER**, Bankruptcy Judges.

_____

**ROMERO**, Chief Judge.

_____

[1] This unpublished opinion may be cited for its persuasive value, but is not precedential, except under the doctrines of law of the case, claim preclusion, and issue preclusion.  10th Cir. BAP L.R. 8026-6.

The subject of how chapter 13 Trustees are to deal with funds in their possession upon the dismissal of a chapter 13 case has received considerable court attention the past few years. This case presents yet another chapter in the ever-evolving manual for dealing with such funds. In the matter before us, judgment creditors in a chapter 13 case dismissed before confirmation moved the Bankruptcy Court for authority to initiate garnishment proceedings against plan payments in the Trustee's possession post-dismissal. The Bankruptcy Court denied the request and this matter is now before us on appeal.

I.    FACTS

Alexander Bednar ("Bednar") is a disbarred Oklahoma attorney who is no stranger to the bankruptcy system. The present saga began in connection with proceedings to foreclose Bednar's interest in real property before the Oklahoma County District Court ("Oklahoma Court"). Specifically, on June 6, 2019, Bednar was ordered by the Oklahoma Court to appear for a hearing on assets.[2] Instead of appearing, Bednar filed a voluntary petition under chapter 13 of the Bankruptcy Code before the United States Bankruptcy Court for the Western District of Oklahoma ("Bankruptcy Court"),[3] causing the hearing to terminate with no action. The First Case was promptly dismissed because Bednar failed to obtain the mandatory credit counseling.[4]

---

[2] Appellants' App. at 112.

[3] Case No. 19-12312 ("First Case"). *See id.*

[4] *Id.*

Subsequently the Oklahoma Court reset the asset hearing.[5] This was followed by Bednar filing another bankruptcy petition, again preventing the hearing from going forward.[6] Bednar failed to appear for the Meeting of Creditors and the Bankruptcy Court dismissed the Second Case on September 6, 2019.[7] Once again, the Oklahoma Court reset the asset hearing,[8] but the third try was not the charm, as Bednar filed bankruptcy yet again on October 1, 2019.[9] These appeals arise from proceedings in the now-dismissed Third Case.

Shortly after Bednar filed the Third Case, Oklahoma County Court Clerk Rick Warren ("Warren") and Deputy Courtroom Clerk Jennifer Byler ("Byler") filed their appearances before the Bankruptcy Court.[10] Warren and Byler, in their official capacities, are each creditors of Bednar by virtue of four sanctions judgments against him: two judgments issued by the Oklahoma Court and two issued by the Oklahoma Supreme Court ("Sanctions Judgments").[11] The four Sanctions Judgments arose upon

---

[5] *Id.*

[6] Case No. 19-12845 ("Second Case"). *See id.*

[7] *Id.*

[8] *Id.*

[9] Case No. 19-14021 ("Third Case"). *See id.*

[10] Appellants' App. at 10 (Bankruptcy Court ECF No. 18).

[11] *Id.* at 111.

findings Bednar engaged in frivolous and vexatious conduct and together total $31,582.50 (excluding interest).

Warren and Byler promptly requested the Bankruptcy Court enter an order confirming the non-existence of the automatic stay in the Third Case pursuant to 11 U.S.C. § 362(c)(4)(A)(i).[12] On October 10, 2019, the Bankruptcy Court agreed and entered an Order confirming there was no stay in effect.[13]

Over the next eight months, Bednar made multiple attempts to confirm a chapter 13 Plan. Each of Bednar's confirmation attempts were opposed by Warren, Byler, chapter 13 Trustee John Hardeman ("Trustee") and Bednar's ex-spouse, Jill Bednar ("J. Bednar").[14] On June 9, 2020, these efforts culminated in a final evidentiary hearing on confirmation of Bednar's Amended Chapter 13 Plan.[15] On June 24, 2020, the Bankruptcy Court sustained the objections to confirmation, finding Bednar was not eligible to proceed under chapter 13.[16] The Bankruptcy Court denied confirmation and dismissed the Third Case effective June 24, 2020.[17] The Bankruptcy Court's dismissal

---

[12] *Id.* at 111-16. All future references to "Bankruptcy Code," "Code," or "§," refer to Title 11 of the United States Code.

[13] *Id.* at 117-18 (Bankruptcy Court ECF No. 20).

[14] J. Bednar asserts non-dischargeable claims related to the parties' divorce for at least $141,469.56. *See id.* at 132.

[15] *Id.* at 275 (Bankruptcy Court ECF No. 81).

[16] *Id.* at 275-76.

[17] *Id.* at 281-82 (Bankruptcy Court ECF No. 82).

order neither reserved jurisdiction for any particular purpose nor altered the typical

revesting of estate property provided in § 349(b).

Before dismissal, Bednar made plan payments totaling $30,838.92.[18]  The Trustee

deducted his fees of $1,572.77, leaving a balance of $29,266.15.  On June 26, 2020,

Warren and Byler filed a motion with the Bankruptcy Court seeking leave to garnish

those funds in the hands of the Trustee.[19]  J. Bednar then filed her own motion for leave

to garnish the funds in the Trustee's possession, asserting her garnishment rights as a

priority creditor holding domestic support obligations were superior over Warren and

Byler's interest as general unsecured creditors.[20]

The Bankruptcy Court entered an order requiring the Trustee to file a response

stating his position and setting a telephonic hearing for July 31, 2020.[21]  The Trustee

responded, stating he opposed allowing garnishment of the funds in his possession.[22]  The

Trustee agreed with Warren, Byler, and J. Bednar that, under the *Barton* doctrine, the

Bankruptcy Court must consent to any garnishment action proceeding in state court.

However, the Trustee also maintained § 1326(a)(2) required him to return any

---

[18] *Id.* at 428.

[19] *Id.* at 283-89.

[20] *Id.* at 354-58.

[21] *Id.* at 359-60.

[22] *Id.* at 361-66.

undistributed plan payments to the Debtor irrespective of the *Barton* doctrine.[23]  The

Bankruptcy Court took the matter under advisement at the end of the telephonic hearing.

On September 2, 2020, the Bankruptcy Court entered its Order Denying Motions for

Leave to Garnish Funds, denying both Oklahoma County's Motion and Bednar's Motion

(the "Order").[24]

The Bankruptcy Court first framed the request, explaining the movants "are

essentially asking this Court to grant them permission to institute garnishment actions

against the Trustee in state court while imposing a stay preventing the Trustee's

distribution of surplus funds as directed by § 1326(a)(2)."[25]  According to the Bankruptcy

Court, "Movants and the Trustee agree that before Movants may initiate garnishment

actions in state court to reach the funds held by the Trustee, the *Barton* Doctrine requires

them to obtain approval from this Court."[26]  Reviewing the policy and intent underlying

the *Barton* doctrine, the Bankruptcy Court found "the relief Movants seek here is the type

of action the *Barton* Doctrine is designed to prevent."[27]

The Bankruptcy Court reasoned the *Barton* doctrine applies in this case to protect

the Trustee from "a tremendous administrative burden . . . requiring him to be personally

---

[23] *Id.*

[24] *Id.* at 427-34.

[25] *Id.* at 430.

[26] *Id.*

[27] *Id.* at 431.

involved in garnishment actions across his district, which stretches across forty counties."[28]  While the Bankruptcy Court acknowledged "the administrative duties may be minimal in this one case," the Bankruptcy Court found "the small burden of one garnishment could quickly swell to a large burden of hundreds of garnishments if creditors are given the green light to file immediately upon the conclusion of every bankruptcy case."[29]  Even though the Bankruptcy Court found the *Barton* doctrine likely prevented the garnishment from being enforced, after reviewing a split of authority on the issue, it ruled the plain language of § 1326(a)(2) requires the Trustee to return the funds to the Debtor with no possibility of any intervening diversion. [30]

Warren, Byler and J. Bednar filed separate notices of appeal on September 15, 2020.  J. Bednar requested the appeals be companioned for briefing and oral argument, and a BAP motions panel (consisting of Judges Michael, Jacobvitz, and Parker) granted the motion on October 13, 2020.  Both appellants requested the Bankruptcy Court stay the Order pending appeal. The Bankruptcy Court granted these requests on October 19, 2020, preventing the Trustee from returning the $29,266.15 to the Debtor prior to disposition of the appeals.

---

[28] *Id.*

[29] *Id.* (internal citation omitted).

[30] *Id.*

## II.     JURISDICTION AND STANDARD OF REVIEW

The Order affects the final distribution of chapter 13 plan payments in the Debtor's underlying bankruptcy case, and therefore is a final appealable order.[31]  Here, the issues on appeal primarily involve pure questions of law which are reviewed *de novo*.[32]  Specifically, the Bankruptcy Court's application of § 1326(a)(2) as a *per se* bar to garnishment of a trustee following dismissal, irrespective of the *Barton* doctrine, is reviewed *de novo*.  Similarly, whether the *Barton* doctrine applies and requires leave to sue presents an issue which is "jurisdictional in nature" and therefore subject to *de novo* review.[33]  However, the Bankruptcy Court's decision to decline leave to sue the Trustee under the *Barton* doctrine is reviewed for abuse of discretion because "the bankruptcy court . . . given its familiarity with the underlying facts and the parties, is uniquely situated to determine whether a claim against the trustee has merit."[34]

---

[31] *See In re Miranda*, 285 B.R. 344, 2001 WL 1538003, at *1 (10th Cir. BAP Dec. 4, 2001) (concluding order denying chapter 13 trustee's motion to distribute 10 percent administrative fee under 28 U.S.C. § 586 from plan payments was a final order) (unpublished);  *In re Yates*, 337 B.R. 728, 2005 WL 2499488, at *2 (10th Cir. BAP Oct. 4, 2005) (holding order denying motion for turnover of funds held by chapter 13 trustee in case converted to chapter 7 was a final order) (unpublished).

[32] *Pierce v. Underwood*, 487 U.S. 552, 558 (1988) ("For purposes of standard of review, decisions by judges are traditionally divided into three categories, denominated questions of law (reviewable *de novo*), questions of fact (reviewable for clear error), and matters of discretion (reviewable for 'abuse of discretion'")).  *See also Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1370 (10th Cir. 1996).

[33]  *Lankford v. Wagner*, 853 F.3d 1119, 1122 (10th Cir. 2017) (conducting *de novo* review of District Court's decision to dismiss suit against trustee under Fed. R. Civ. P. 12(b)(1) where plaintiffs did not seek or obtain leave under the *Barton* doctrine).

[34] *See In re VistaCare Grp., LLC*, 678 F.3d 218, 232-33 (3d Cir. 2012).

8

III.    ANALYSIS

a.    *Barton* Doctrine

Bankruptcy law, as it has evolved in United States jurisprudence, has led to the creation of a few relatively obscure doctrines.  One such concept, the *Barton* doctrine, was established in *Barton v. Barbour*, 104 U.S. 126 (1881), and requires before suit can be brought against bankruptcy trustees or their counsel for acts taken in their official capacities during a bankruptcy case, the plaintiff must first seek leave of the overseeing bankruptcy court.[35]  The *Barton* doctrine includes actions seeking bankruptcy estate property as well as actions against a bankruptcy trustee for conduct during the pendency of the bankruptcy case.[36]  Because of this, the *Barton* doctrine is "jurisdictional in nature."[37]  As explained by the Bankruptcy Court, the doctrine "exists to ensure other courts do not intervene in the bankruptcy court's administration of an estate without permission."[38]  Generally, the *Barton* doctrine is intended:  "(1) to maintain the integrity of the bankruptcy court's jurisdiction; (2) to control burdensome litigation that may

---

[35] *See In re Lane*, No. 11-20398 at ECF No. 1787 at 4-5 (Bankr. D. Wyo. Sept. 9, 2020) (citing *Lankford*, 853 F.3d at 1122).

[36] *Id.* (citing *In re Delta Invs. & Dev., LLC*, No. 12-01160-NPO, 2019 WL 137578, at *14 (Bankr. S.D. Miss. Jan. 8, 2019) (unpublished)).

[37] *Id*. at 5 (citing *Lankford*, 853 F.3d at 1122).

[38] *Satterfield v. Malloy*, 700 F.3d 1231, 1237 (10th Cir. 2012).

impede the trustee's work as an officer of the court; and (3) to allow the bankruptcy court to monitor effectively the trustee's work."[39]

In *Satterfield v. Malloy,*[40] the Tenth Circuit Court of Appeals expounded on the functions and purposes of the *Barton* doctrine. The court began by examining the language of *Barton v. Barbour* itself, noting "[a] plaintiff who brings such a suit [against a receiver] . . . attempts to 'obtain some advantage over the other claimants upon the assets in the receivers hands.'"[41] "If allowed to proceed, 'the court which appointed the receiver and was administering the trust assets would be impotent to restrain' such a plaintiff, complicating the proper administration of the estate.'"[42]

Because the *Barton* doctrine is focused on protecting the receiver from impediments to administration, as well as ensuring equality among competing claimants, the Tenth Circuit applies the *Barton* doctrine to bankruptcy trustees as to "'acts done in the trustee's official capacity and within the trustee's authority as an officer of the court.'"[43] The court further reasoned if a trustee "is burdened with having to defend against suits by litigants disappointed by his actions on the court's behalf, his work for

---

[39] *In re Horton*, 612 B.R. 400, 404 (Bankr. D.N.M. 2020) (citations omitted).

[40]  *Satterfield*, 700 F.3d at 1234-35; *see also Lankford,* 853 F.3d at 1122.

[41] *Satterfield*, at 1235 (quoting *Barton v. Barbour*, 104 U.S. 126 (1881)).

[42] *Id.*

[43] *Id.* (quoting *Heavrin v. Schilling (In re Triple S Rests., Inc.*), 519 F.3d 575, 578 (6th Cir. 2008)).

the court will be impeded."[44]  Moreover, the *Barton* doctrine continues to apply after

dismissal of a bankruptcy case because:

> Without the requirement [of obtaining leave from the appointing court],
> trusteeship will become a more irksome duty, and so it will be harder for
> courts to find competent people to appoint as trustees.  Trustees will have to
> pay higher malpractice premiums, and this will make the administration of
> bankruptcy laws more expensive (and the expense of bankruptcy is already
> a source of considerable concern).  Furthermore, requiring that leave to sue
> be sought enables bankruptcy judges to monitor the work of the trustees
> more effectively.  It does this by compelling suits growing out of that work
> to be as it were prefiled before the bankruptcy judge that made the
> appointment; this helps the judge to decide whether to approve this trustee
> in a subsequent case.[45]

In sum, in the Tenth Circuit the *Barton* doctrine "exists to ensure other courts do

not intervene in the bankruptcy court's administration of an estate without permission."[46]

As explained by an Indiana bankruptcy court in *In re Shields*, the *Barton* doctrine applies

to prevent the trustee's performance from being "compromised by state court proceedings

that divert the Trustee's attention."[47]   Thus, "[t]he Trustee should not be required to

defend against or otherwise appear in state court each time he is served with the

garnishment order."[48]  A Georgia bankruptcy court in *In re Jankauskas* expanded on

---

[44] *Id.*

[45] *Id.* at 1236-37 (quoting *In re Linton*, 136 F.3d 544, 545 (7th Cir. 1998)).

[46] *Id.* at 1237.

[47] *In re Shields*, 431 B.R. 446, 452 (Bankr. S.D. Ind. 2010).

[48] *Id.*

11

*Shields's* application of the *Barton* doctrine to post-dismissal garnishments.[49] The court explained the *Barton* doctrine applies to post-dismissal garnishments because trustees may have residual liability to the issuing court for failure to comply with the mandate of the garnishment.[50]

In this case, the proposed garnishment directly implicates the Trustee's fiduciary duties to Bednar with respect to property that was formerly part of the estate.[51] The garnishment would also affect the Trustee's final administration of the estate by determining to whom the residual funds should be paid. Thus, the Panel agrees with the Bankruptcy Court the *Barton* doctrine applies. Importantly, however, this holding speaks only to whether pre-suit leave is required, not whether such leave should or should not be granted. As noted by the court in *Jankauskas*, "application of the *Barton* doctrine does not establish a *per se* ban on garnishments against a trustee, it merely requires bankruptcy court approval before the garnishment may be filed."[52]

---

[49] *In re Jankauskas*, 593 B.R. 1, 9 (Bankr. N.D. Ga. 2018).

[50] *Id.* at 10.

[51] *See In re Christensen*, 598 B.R. 658, 668-69 (Bankr. D. Utah 2019) (holding *Barton* doctrine required leave to sue trustee for negotiating short-sale for improper motive, explaining "[a] trustee becomes a fiduciary vis-à-vis a debtor because he holds property that belongs to the debtor by operation of law. The scope of his duty, therefore, is strictly limited to safeguarding property of the estate in the trustee's possession or the proceeds from the sale thereof to which the debtor is entitled and ensuring that the debtor receives that property.").

[52] *Jankauskas*, 593 B.R. at 11-12.

12

In *In re VistaCare Group*, the Third Circuit Court of Appeals reviewed the bankruptcy court's order granting *Barton* leave to sue a trustee and expounded on the factors bearing on the court's decision.[53]  First, the party seeking *Barton* leave "'must make a prima facie case against the trustee, showing that its claim is not without foundation.'"[54]  Second, the bankruptcy court should consider the "potential effect of a judgment against the trustee on the debtor's estate."[55]  This "may involve a 'balancing of the interests of all parties involved' and consideration of whether another tribunal may have expertise regarding the issues in the proposed suit."[56]  However, the bankruptcy court "is not required to consider immunities and defenses raised by a trustee when evaluating a motion for leave.  A bankruptcy court cannot be expected to conduct a trial on the merits of a party's proposed state law claim against a trustee simply to decide whether to grant leave to purse such a claim in state court."[57]  Instead, the trustee preserves any defenses for adjudication in the state court.[58]

In *In re Christenson*, the bankruptcy court ruled it would exercise its discretion to deny *Barton* leave to sue a trustee because none of the claims passed muster under the

---

[53] *In re VistaCare Grp., LLC*, 678 F.3d 218, 232-33 (3d Cir. 2012).

[54] *Id.* at 232 (quoting *In re Nat'l Molding Co.*, 230 F.2d 69, 71 (3d Cir. 1956)).

[55] *Id.*

[56] *Id.*

[57] *Id.* at 234-35.

[58] *Id.*

prima facie analysis.[59]  Further, it held "even if" the proposed claims were found to be

merited, the bankruptcy court would take guidance from the Ninth Circuit Bankruptcy

Appellate Panel in *In re Kashani*.[60]  Specifically, the *Kashani* panel enumerated five

factors bankruptcy courts should consider in deciding whether to grant *Barton* leave:

> 1.  Whether the acts or transactions relate to the carrying on of the business connected with the property of the bankruptcy estate.  If the proceeding is under 28 U.S.C. § 959(a), then no court approval is necessary.  However, the moving party may request this initial review by the bankruptcy court in the motion for leave to sue the trustee, or perhaps in the form of a complaint, seeking a declaratory judgment from the bankruptcy court.
> 2.  If approval from the appointing court appears necessary, do the claims pertain to actions of the trustee while administering the estate?  By asking this question, the court may determine whether the proceeding is a core proceeding or a proceeding which is related to a case or proceeding under Title 11, United States Code.
> 3.  Do the claims involve the individual acting within the scope of his or her authority under the statute or orders of the bankruptcy court, so that the trustee is entitled to quasi-judicial or derived judicial immunity?
> 4.  Are the movants or proposed plaintiffs seeking to surcharge the trustee; that is, seeking a judgment against the trustee personally?
> 5.  Do the claims involve the trustee's breaching her fiduciary duty either through negligent or willful misconduct?[61]

By conducting such an analysis, the bankruptcy court will determine

whether the issues affect solely the administration of the bankruptcy estate and

should be heard by the bankruptcy court.  The bankruptcy court will also be able

to determine whether the claims have been previously decided on the merits and

---

[59] *In re Christensen*, 598 B.R. 658, 673 (Bankr. D. Utah 2019).

[60] *Id.* (citing *Kashani v. Fulton (In re Kashani)*, 190 B.R. 875, 886-87 (9th Cir. BAP 1995)).

[61] *Kashani*, 190 B.R. at 886-87.

should not be pursued by the movants or proposed plaintiffs on the basis of res judicata or collateral estoppel.  The bankruptcy court will also be in a position to determine whether the trustee is entitled to quasi-judicial or derived judicial immunity.  Again, one or more of these factors may be a basis for the bankruptcy court to retain jurisdiction over the claims.  Such an analysis will also assist the bankruptcy court in determining which claims should be tried in another forum.[62]

Here, it appears the Bankruptcy Court's Order in analyzing whether leave should be granted focused upon mere speculation by the trustee that generally opening the trustee to garnishment proceedings post-dismissal could create "a tremendous administrative burden on him."[63]  As the foregoing authorities show, a bankruptcy court's exercise of discretion on a *Barton* question is much broader in scope and encompasses much wider factors than potential inconvenience or burden to the Trustee.  The mere possibility of inconvenience cannot serve as a blanket protection for trustees from a legal process to which any other person may ordinarily be subjected.  It is significant the Bankruptcy Court acknowledged in its decision "the administrative duties may be minimal in this one case."[64]  In making a *Barton* determination, a bankruptcy court should gather all relevant facts, and then consider the meritorious foundations of the

---

[62] *Id.*

[63] Order at 5, *in* Appellants' App. at 431.

[64] *Id.*

garnishment claims, as well as the factors identified in the case law discussed herein, particularly *VistaCare Group* and *Kashani.*.

In sum, on *de novo* review, the Panel holds the *Barton* doctrine required Warren, Byler and J. Bednar obtain approval of the Bankruptcy Court before commencing their garnishment actions.  However, the Panel further concludes the Bankruptcy Court abused its discretion by denying *Barton* leave based upon unsupported allegations of potential inconvenience to the Trustee without weighing the other important factors bearing upon such a decision.

b.    Section 1326

Notwithstanding its conclusion that the *Barton* doctrine prohibited the enforceability of the garnishment in question, the Bankruptcy Court also dealt with whether the proposed garnishment was also prohibited by § 1326(a)(2).

Whether the Bankruptcy Code permits creditor garnishment of the Trustee following dismissal of a bankruptcy case without a confirmed chapter 13 plan is a question of statutory interpretation, which naturally begins with the language of the statute itself.  The initial inquiry is whether there is ambiguity in the relevant Code sections because "where . . . the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.'"[65]  Here, § 1326(a)(2) provides plan payments

---

[65] *United States v. Ron Pair Enters.*, 489 U.S. 235, 241 (1989) (quoting *Caminetti v. United States*, 242 U.S. 470, 485 (1917)).

shall be retained by the trustee until confirmation or denial of confirmation. If a plan is confirmed, the trustee shall distribute any such payment in accordance with the plan as soon as is practicable. If a plan is not confirmed, the trustee shall return any such payments not previously paid and not yet due and owing to creditors . . . to the debtor, after deducting any unpaid claim allowed under section 503(b).[66]

Of course, § 1326 dovetails into the basic revesting language set forth in § 349(b)(3), which provides dismissal "revests the property of the estate in the entity in which such property was vested immediately before the commencement of the case under this title."[67]

As recognized by the Bankruptcy Court, there is a split of authority in the application of § 1326(a)(2). Some courts apply a plain meaning analysis to conclude § 1326(a)(2) and § 349(b)(3) unambiguously require the return of all plan payments to the debtor following pre-confirmation dismissal. Other courts find ambiguity in § 1326(a)(2) within the context of § 349(b)(3), and instead focus on the technical functionality of the competing Code provisions.

> i.    *Plain Meaning Cases*

The Bankruptcy Court adopted the view of those cases holding the plain language of § 1326(a)(2) directs return of plan payments to debtors whose cases are dismissed before confirmation. For example, in *In re Oliver* the court reviewed earlier case law and concluded "section 13265(a)(2) [is] unambiguous, and the plain language of § 1326(a)(2)

---

[66] 11 U.S.C. § 1326(a)(2).

[67] 11 U.S. C. § 1326(b)(3).

required the Trustee to turn over all funds to the debtor."[68]  The court reasoned its

conclusion would "place[] all of the relative parties in a position as near as possible to

where they would have been if the debtor had never filed for protection under the

Bankruptcy Code."[69]

Several years later, the court in *In re Davis* adopted what it referred to as the "*In re*

*Oliver* line of cases," which hold § 1326(a) is clear and unambiguous with regard to the

disposition of funds.[70]  The *Davis* court went further to expressly hold § 1326 "preempts

the state court garnishment statute" with respect to the trustee's duty to return funds to

the debtor.[71]  In reaching these conclusions, the *Davis* court relied heavily on its view of

the public policy underlying § 1326.  As the court explained, the return of funds to the

debtor "fosters the policy of encouraging debtors who are financially able to repay their

debts to file Chapter 13.  It ensures that debtors who attempt chapter 13 will not be

penalized for an unconfirmed attempt."[72]  The *Davis* court also reasoned the *Oliver*

approach ensures the "orderly and efficient disposition of chapter 13 cases" by ensuring

---

[68] *In re Oliver*, 222 B.R. 272, 274 (Bankr. E.D. Va. 1998) (adopting the reasoning of *In re Walter*, 199 B.R. 390 (Bankr. C.D. Ill. 1996) and *In re Clifford*, 182 B.R. 229 (Bankr. N.D. Ill. 1995)).

[69] *Id.* at 275.  *See also In re Hamilton*, 493 B.R. 31, 37-38 (Bankr. M.D. Tenn. 2013) (focusing on § 349(b) as the basis for the policy of returning debtors to their pre-petition *status quo ante*).

[70] *In re Davis*, No. 04-30002-DHW, 2004 WL 3310531 at *2 (Bankr. M.D. Ala. June 16, 2004) (unpublished).

[71] *Id.*

[72] *Id.*

18

"any attempts to reach the money would ensue outside the jurisdiction of the bankruptcy court" so cases "may be closed as quickly as statutorily possible following dismissal."[73] Thus, "[h]olding to the contrary would create a 'race to the trustee' and effectively ignore the statutory mandate to return the money to the debtor."[74]

The court in *Commonwealth of Virginia v. Beskin* framed its plain language approach against the Supreme Court's expressed views on the voluntary nature of chapter 13 proceedings.[75] In *Harris v. Vieglahn*, the Court stated "the 'wholly voluntary' process of chapter 13 bankruptcy is meant to 'benefit debtors and creditors alike.'"[76] Moreover, in *Czyzewski v. Jevic Holding Corp.*, the Court "emphasized that dismissal of a bankruptcy case 'aims to return to the prepetition financial status quo.'"[77]

In sum, courts adopting the plain language approach to post-dismissal pre-confirmation garnishment find harmony between the wording of § 1326 and the policy purposes served by the statutory language. The court in *In re Inyamah* summarized this view by enumerating three "statutory purposes" served by the plain language of § 1326:

> As noted by the *In re Davis* court, returning the funds to debtors accomplishes three statutory purposes: (1) when plans fail allowing creditors to seize debtors' funds would be in conflict with the policy of encouraging chapter 13 filings; (2) return of the funds to debtors allows for

---

[73] *Id.*

[74] *Id.*

[75] *Commonwealth of Virginia v. Beskin*, 581 B.R. 162, 166 (Bankr. W.D. Va. 2017), *aff'd sub nom. Commonwealth of Virginia v. Webb*, 908 F.3d 941 (4th Cir. 2018).

[76] *Id.* (quoting *Harris v. Viegelahn*, 575 U.S. 510 (2015)).

[77] *Id.* (quoting *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973 (2015)).

the prompt closing of the estate by precluding conflicting efforts of creditors to gain access to funds held by chapter 13 trustees; and (3) returning funds to debtors fosters the concept of revesting upon dismissal by placing the funds in their hands thereby restoring all parties to their original positions.[78]

### ii.    The "Debtor of a Debtor" Cases

The divergent line of cases, which approve of post-dismissal trustee garnishments, not only takes a different view of the statutory language, but also the underlying policy motivations.  These cases generally do not disagree with the plain language interpretation of § 1326, but instead take a more practical approach which gives the language more meaning within the broader context of the Code.

The first such case is *In re Steenstra*.[79]  There, the debtor's chapter 13 case was dismissed prior to confirmation of a plan and was followed by efforts to levy plan payments held by the trustee.[80]  The bankruptcy court followed the plain language approach to § 1326, holding the funds remained *in custodia legis* and were not subject to levy until the case was closed.[81]  The First Circuit Bankruptcy Appellate Panel reversed, approving the notion of post-dismissal garnishment.

---

[78] *In re Inyamah*, 378 B.R. 183, 185 (Bankr. S.D. Ohio 2007).  *See also In re Locascio*, 481 B.R. 285, 289 (Bankr. S.D.N.Y. 2012) ("The plain language of section 1326(a)(2), the policies behind that provision, and the Supremacy Clause all mandate return of plan payments directly to the debtor upon dismissal, despite the existence of a garnishment."); *In re Hamilton*, 493 B.R.at  31.

[79] *In re Steenstra*, 307 B.R. 732 (1st Cir. BAP 2004).

[80] *Id.* at 735.

[81] *Id.*

20

First, the panel focused on the termination of the bankruptcy estate and the automatic stay upon entry of a dismissal order.[82] Thus, while § 1326(a)(2) and § 349(b)(3) ostensibly require a trustee return payments to the debtor, any such payments lose the protection of the automatic stay upon dismissal.[83] In the panel's view, this is critical because "the revestment is not immediate or automatic."[84] For example, § 1326(a)(2) requires the trustee to pay administrative expenses before returning the funds to the debtor.[85] In this sense, "before the funds may be returned to the debtor, the chapter 13 trustee must complete the administration of the case. . . ."[86] Because the trustee's withholding of administrative expenses occurs before the funds are returned to the debtor, the funds payable for such expenses "are protected from levy or garnishment" as part of trustee's ongoing estate administration.[87] The question, then, is whether "the remaining funds are also protected from levy or garnishment once the automatic stay has terminated."[88]

---

[82] *Id.* at 737-38 ("[D]ismissal of a bankruptcy petition 'has the simultaneous effect of undoing the bankruptcy estate and lifting the automatic stay[.]'") (quoting *In re Garnett*, 303 B.R. 274, 278 (E.D.N.Y. 2003)).

[83] *Id.*

[84] *Id.* at 738.

[85] *Id.*

[86] *Id.*

[87] *Id.*

[88] *Id.*

The panel then approvingly cited *In re Doherty* as expressing the correct reasoning upon which to consider this question. In *Doherty,* the court "reasoned that because the dismissal order terminated the automatic stay, there was no stay in place to protect the funds held by the trustee after the court entered the dismissal order."[89] "Because the dismissal of a bankruptcy case prior to confirmation removes the protections afforded by the Bankruptcy Code, the funds belonging to the debtor but which are held by the trustee are not afforded protection from levy merely because they were once part of the estate."[90] This creates what the *Steenstra* panel approvingly referred to as the "debtor of the debtor" approach to the trustee's predicament:

> [T]he Court finds that, once the order of dismissal is entered, and the stay has been lifted, and the Trustee has been ordered to turn over the funds to the Debtor, she becomes a debtor of the Debtor to that extent. The funds held by the Trustee are subject to levy or garnishment by creditors of the Debtor, pursuant to applicable law. The Trustee is bound to accept the levy if she has any money that belongs to the Debtor.[91]

Finally, the *Steenstra* panel considered whether the funds are excepted from the possibility of levy because they remained within the bankruptcy court's custody and control pursuant to the doctrine of *in custodia legis*.[92] The panel rejected the possibility of protection through this doctrine, reasoning that in the absence of a formal retention of jurisdiction, entry of the dismissal order retires the bankruptcy court's duties and

---

[89] *Id.* at 739 (quoting *In re Doherty*, 229 B.R. 461 (Bankr. E.D. Wash. 1999)).

[90] *Id.*

[91] *Id.* at 740 (quoting *In re Schlapper*, 195 B.R. 805, 806 (Bankr. M.D. Fla. 1996)).

[92] *Id.*

jurisdiction with respect to property formerly part of the now non-existent estate.[93]  In

contrast, *in custodia legis* "relates to specific funds held by the court for a specific

purpose."[94]  "[W]here nothing more remains for the custodian to do but make delivery of

the property or payment of the money, the reason for the doctrine of *in custodia legis* is

satisfied[.]"[95]

The court in *In re Fischer* followed similar reasoning to conclude garnishment had

no effect on the trustee's obligation to return funds to the debtor.[96]  First, the *Fischer*

court reasoned:

> In short, there is nothing special about funds the Chapter 13 trustee holds
> that should prevent a creditor from proceeding with garnishment after
> dismissal of a Chapter 13 case.  If the trustee is holding funds that belong to
> the debtor, viz-a-viz a third party creditor with a writ of garnishment, the
> trustee is just like any other "debtor of the debtor," and a creditor should
> not be prevented from garnishing such funds.[97]

Importantly, the *Fischer* court went on to reconcile its approach with the "plain

meaning" reasoning of courts reaching the opposite conclusion.  Rather than finding

§ 1326 ambiguous, the *Fischer* court explained the statute "simply states that the 'trustee

shall return' to the debtor any payments made in accordance with an unconfirmed

---

[93] *Id.*

[94] *Id.*

[95] *Id.* at 741 (quoting *United States v. Powell,* 492 F. Supp. 1030, 1032 (W.D. Tex. 1980), *aff'd,* 639 F.2d 224 (5th Cir. 1981)).

[96] *In re Fischer*, 432 B.R. 863, 864 (Bankr. M.D. Fla. 2010).

[97] *Id.* at 865.

plan."[98]  According to *Fischer*, nothing in the plain language of § 1326(a) *prohibits* post-dismissal garnishment, but rather operates to prevent the trustee from retaining the funds or distributing them to an unrelated party.[99]  Thus, "there is no difference between this situation and a typical wage garnishment in which an employee is entitled to any wages earned, *except* when a creditor has a valid writ of garnishment allowing it to garnish wages held by the employer."[100]

The court in *In re Cohen* also followed the "debtor of a debtor" reasoning, but further responded to the purported policy justifications referenced in the plain meaning cases (for example, those articulated by the court in *Inyamah*).[101]  First, the court rejected the idea that returning plan payments to debtors encourages chapter 13 filings by not penalizing debtors for their failed efforts.  The court reasoned this policy "fails to explain why a debtor who did not confirm a plan is given greater consideration than one whose plan is confirmed.  Additionally, this argument may encourage bad-faith filings solely motivated by the purpose of avoiding payment obligations."[102]  In the court's view, a hypothetical debtor "could file bankruptcy, receive protection from garnishment against

---

[98] *Id.*

[99] *Id.*

[100] *Id.  See also In re Price*, 484 B.R. 870, 873-74 (Bankr. E.D. Ark. 2013) ("[A] trustee who owes amounts to a debtor is not any different than any other party that is subject to a garnishment.").

[101] *In re Cohen*, No. 2:14-bk-11079-DPC, 2016 WL 797656 (Bankr. D. Ariz. Feb. 29, 2016) (unpublished).

[102] *Id.* at *5.

his wages, fail to confirm a plan, receive those funds back safely from the trustee, and then potentially spend those funds before a creditor could reinstate a wage garnishment after the case is dismissed."[103]  The result of such a practice could be "rewarding debtors who do not produce a viable plan, while not extending similar protections to debtors who made serious efforts toward repaying creditors."[104]

Next, the *Cohen* court was not persuaded by the argument levy orders impose additional administrative burdens on the trustee's office.  The court reasoned the trustee has no stake in who gets the money, and therefore can comply with a garnishment as easily as she could return the funds to the debtor.[105]  Moreover, trustees can avoid the problem altogether by immediately returning the funds upon dismissal, avoiding a race to the trustee by preempting any garnishment efforts.[106]

Finally, the *Cohen* court addressed the purported policy behind the plain language approach to § 1326 to return debtors to the pre-petition *status quo ante*.  These arguments "greatly overlook[] the protections chapter 13 provides debtors" because prior to dismissal "a debtor will have had the advantage of the bankruptcy automatic stay and their income will have been protected against garnishment and levies all the while."[107]

---

[103] *Id.*

[104] *Id.*

[105] *Id.*

[106] *Id.*

[107] *Id.*

Indeed, the court observed "[a]bsent the bankruptcy automatic stay, those funds likely would have been garnished or levied at an earlier time."[108]  Therefore, returning the funds to the debtor after dismissal does not actually return debtor to his pre-petition status, but rather, enhances the debtor's position by enabling him to delay levy with no consequence.[109]

Arguably, the foregoing analyses reach different conclusions from the plain language cases without necessarily disagreeing on whether § 1326 is plain and unambiguous.  Rather, these cases can be viewed as simply taking a more nuanced and functional approach to applying the statute.  The court in *Shields* expanded on this dynamic, while comprehensively summarizing the debtor of a debtor approach:

> Assuming that § 1326(a)(2) applies in dismissed cases, it does not, and cannot, provide for every scenario for disposition of funds in a dismissed case with an unconfirmed plan.  For example, to whom should the funds be returned upon the death of a debtor?  Upon incarceration of a debtor?  Upon incompetency of a debtor for which a guardian has been appointed?  Would the Trustee argue § 1326(a)(2) directs him to pay the funds to the debtor in such cases?  If the funds cannot be returned to the debtor due to the debtor's incarceration, incompetency or death, would the trustee hold the funds indefinitely?
>
> ***
>
> I conclude that what § 1326(a)(2) and § 349(b)(3) *do* unambiguously provide for is the return of the funds to (after payment of § 503(b) expenses) and the revesting of property in the debtor *where there are no post dismissal intervening events that challenge the debtor's right to receive the funds or claim the property.*  However, application of these sections beyond this garden variety scenario, in my opinion, just was not

---

[108] *Id.*

[109] *Id.*

26

contemplated by Congress. . . .  I do not believe that Congress would have so easily disregarded creditors who, free from the automatic stay, enforce their judgments by obtaining valid state court garnishment orders and levying property that is neither property of the estate nor property needed to pay administrative claims. Had Congress intended to sequester funds from these creditors under these circumstances, it certainly knew how to provide for it and could have added "notwithstanding any challenge after dismissal but before closing of the case" or similar language to § 1326(a)(2) or § 349(b)(3). . . .

Rather, I follow the lead of the *Steenstra* and *Doherty* cases and conclude that, § 362 controls here. As stated in those cases, dismissal of a case terminates the automatic stay and the bankruptcy estate.  What was formerly property of the estate revests in the entity in which it was vested prior to the commencement of the case under § 349(b)(3) and is no longer property of the estate.  Such property loses the protection of the automatic stay upon dismissal under § 362(c)(1) and nothing in § 362, § 349, or § 1326 expressly shields from levy funds that are not needed to pay § 503(b) claims. Since the funds are not protected, they are subject to levy and the trustee is like any other third-party holding funds owed to a debtor against which a judgment creditor has levied.[110]

The Panel agrees with the reasoning of the "debtor of the debtor" approach as summarized by *Shields*.  The plain language cases are attractive for their simplicity, but their literalistic approach to § 1326(a)(2) fails to account for the functional practicalities of the tripartite relationship between the trustee, the garnishor, and the debtor.  Because of the termination of the automatic stay and the non-existence of the prior bankruptcy estate upon entry of a dismissal order, the Trustee is effectively no longer operating as court-appointed fiduciary.  Certainly, the Trustee can no longer be thought of as a representative of the estate exercising control over property of the estate.

---

[110] *In re Shields*, 431 B.R. 446, 450-51 (Bankr. S.D. Ind. 2010).  *See also In re Jankauskas*, 593 B.R. 1 (Bankr. N.D. Ga. 2018).

Instead, the legal relationship between the debtor and a trustee following dismissal is akin to a traditional bailment.[111]  The debtor has voluntarily transferred personal property to a third party who, absent the duties of a trustee as estate representative, is merely a custodian safeguarding the debtor's property in a trustee's hands.  As discussed hereinabove, a similarly situated custodian, such as a bank, is not excused from complying with a levy or garnishment concerning the subject property.  The Panel sees no reason why a different rule should apply to trustees merely because they were formerly an estate representative and the property used to be *in custodia legis* through an estate which no longer exists.

Moreover, even under the plain language approach, there is reason to question whether a trustee's compliance with the garnishment even violates the statutory direction to return the funds to the debtor.  While the trustee physically completes the transfer of *possession* of the money to the garnishor, the transfer of *title* to the property occurs through operation of state law, not by action of the trustee.  This must be so because, as discussed, the trustee merely holds possession of, but not title to, the funds after dismissal.

Upon delivery of the garnished funds, the debtor's ownership interest is removed while the debtor's liability on the underlying debt is reduced.  Both sides of the

---

[111] *See Chambers v. Morgan*, 671 P.2d 89, 90 (Okla. App. 1983) ("Bailment is a legal status created by the transference of possession of personal property to another for the accomplishment of some particular purpose and establishes a bailor-bailee [ ] relationship.").

transactional ledger must be considered, especially in a post-dismissal reference frame where the debtor is no longer seeking reorganization or discharge.  In this sense, the trustee would in fact be returning the property to the debtor, not in the form of a cash payment, but in the form of a debt reduction.  In the same sense, the trustee is also returning debtor's ledger to its pre-petition status—the property and liability columns have changed but in equal amounts on each side.  The transfer may not be to the debtor, but it is nevertheless made for the debtor's benefit.[112]

IV. CONCLUSION

Trustees play an invaluable role in the bankruptcy process and the *Barton* doctrine provides appropriate protection against litigation which may seriously and adversely affect the execution of their duties.  The line is difficult to enunciate; but we believe more than mere inconvenience is required to trigger such prohibition of actions against a trustee once a case has been dismissed.  Further, once a case is dismissed, if the *Barton* doctrine does not prohibit a proposed garnishment action, a trustee sits in a similar position to any other party holding money for another and subject to garnishment.

---

[112] This approach also comports with the court's solution in *Shields*.  There, the court directed the trustee to issue a check in the debtor's name, but to deliver the check to the possession of the state court which issued the writ of garnishment for further proceedings. *Shields*, 431 B.R. at 452.  The court explained "[b]y ordering the Trustee to issue the Check payable to the Debtors and to send it to the State Court, the Trustee's concerns with § 1326(a)(2)'s 'mandate' are allayed, and the Court preserves a source of recovery" for the creditor.  *Id.*

29

For the foregoing reasons the decision of the Bankruptcy Court is REVERSED and REMANDED for the purpose of conducting further proceedings on the *Barton* doctrine issues consistent with this opinion.